**SO ORDERED.**

**SIGNED this 5 day of June, 2014.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:

| | |
|---|---|
| TANGLEWOOD FARMS, INC. OF ELIZABETH CITY, | CHAPTER 7 <br> CASE NUMBER: 10-06719-8-RDD |
| DEBTOR | |
| JAMES B. ANGELL, TRUSTEE, | ADVERSARY PROCEEDING <br> NUMBER: 12-00178-8-RDD |
| PLAINTIFF, | |
| v. | |
| OPEN GROUNDS FARM, INC., BELVIDERE FARMS EXCHANGE, INC., | |
| DEFENDANTS. | |

## ORDER GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AGAINST OPEN GROUNDS FARM, INC.

Pending before the Court is the Motion for Summary Judgment Against Open Grounds Farm, Inc. and Memorandum In Support filed by James B. Angell, the Chapter 7 Trustee (the "Trustee"), on October 25, 2013 (the "Motion for Summary Judgment"); the Response to Motion for Summary Judgment and Memorandum in Support filed by Open Grounds Farm, Inc. ("Open Grounds") on November 15, 2014 (the "Objection"); the Supplemental Memorandum of Law in

Support of Response to Motion for Summary Judgment filed by Open Grounds Farm, Inc. on February 14, 2014 (the "Objection Supplement"); and the Trustee's Reply Memorandum in Support of Summary Judgment filed by the Trustee on April 11, 2014 ("Reply to Objection Supplement"). The Court conducted a hearing on April 15, 2014, to consider these matters. At the conclusion of the hearing, the Court took these matters under advisement and gave the parties twenty-one (21) days to submit briefs. On May 6, 2014, the Trustee filed the Post-Hearing Memorandum of Law in Support of Summary Judgment Against Open Grounds Farm, Inc. and on May 14, 2014, Open Grounds filed the Response to the Trustee's Post-Hearing Memorandum of Law in Support of Summary Judgment Against Open Grounds Farm, Inc., and Incorporated Memorandum of Law.

## JURISDICTION

Subject matter jurisdiction and jurisdiction over the parties exists pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference of the United States District Court for the Eastern District of North Carolina dated August 3, 1984.

This matter is a core proceeding as set forth in Section 157(b)(2) of Title 28 of the United States Code.

## STANDARD FOR SUMMARY JUDGMENT

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the non-moving party.

2

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If there is no genuine issue of material fact, and the issue to be decided is a matter of law, a ruling on a motion for summary judgment is appropriate. However, if there are genuine issues of material fact, then summary judgment is not appropriate. For the reasons set forth below, the Motion for Summary Judgment will be **GRANTED.**

## FACTUAL HISTORY

Tanglewood Farms, Inc. of Elizabeth City (the "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code") on August 20, 2010 (the "Petition Date"). The Chapter 11 case was converted to one under Chapter 7 on July 12, 2011 (the "Chapter 7 Case"). James B. Angell was duly appointed as the Trustee in the Chapter 7 Case pursuant to the Order Appointing Interim Trustee and Approving Standing Bond entered by the Court on July 12, 2011. The individual bankruptcy case of James H. Winslow ("Mr. Winslow") and his wife, Billie Winslow ("Mrs. Winslow") was filed on August 23, 2010, under Chapter 11 of the Code bearing case number 10-06745-8-ATS (the "Winslow Case"). In addition to Mr. Winslow's personal farming operations, he was the 100% shareholder and President of the Debtor. Pursuant to the Order Confirming Chapter 11 Plan in the Winslow Case, Mr. Winslow has continued to operate his personal farming business under the management of a Chief Restructuring Officer and Plan Trustee.

Open Grounds is a corporation located in Carteret County and organized under the laws of the State of North Carolina. Open Grounds owns approximately 50,000 acres of land. Open Grounds farms, harvests grain, and rents a portion of its farmland to third party farmers. Belvidere

3

Farmers Exchange, Inc. ("Belvidere") is a grain dealer organized under the laws of the State of North Carolina. Prior to the Petition Date, the owners and shareholders of Belvidere were Mr. Winslow and William Dan Nixon ("Mr. Nixon"). Open Grounds entered into two agreements renting farmland to Mr. Winslow for 2007, described in the 2007 Land Rent Agreement ("2007 Agreement") and for 2008 through 2009, described in the 2008-2009 Land Rent Agreement ("2008-2009 Agreement"). In 2008 and 2009, Open Grounds rented approximately 6,012.3 acres to Mr. Winslow to grow grain including corn, wheat, and soybeans. Prior to the transfers at issue, Mr. Winslow paid land rent to Open Grounds Farm from his personal bank account.

Pursuant to the 2008-2009 Land Rent Agreement, Mr. Winslow was individually obligated to Open Grounds for payment of rent in the total sum of $1,322,706.00. According to the addendum to the 2008-2009 Land Rent Agreement, Mr. Winslow's land rent was due in three installments as follows: $300,000.00 by February 15, 2009; $500,000.00 by July 15, 2009; and $522,706.00 by September 15, 2009. Between March 4, 2009 and October 22, 2009, Open Grounds received payments in the total sum of $1,322,706.00 (the "2009 Land Rent Payments") Open Grounds applied the 2009 Land Rent Payments to Mr. Winslow's land rent. Three different sources tendered the 2009 Land Rent Payments as follows: (i) Mr. Winslow tendered $400,000.00; (ii) Belvidere tendered $550,000.00; and (iii) J.C. Howard Farms tendered $372,704.29. According to a statement prepared by Open Grounds (the "2009 Land Rent Statement"), Mr. Winslow paid the first land rent installment in the amount of $300,000.00 by personal check on or about March 4, 2009. The second installment in the amount of $500,000.00 was due on July 15, 2009.  Mr. Winslow failed to timely remit the second installment.

4

On August 26, 2009, Open Grounds sent a letter (the "Default Letter") to Mr. Winslow notifying him that he was in default of the 2008-2009 Land Rent Agreement based on his failure to timely submit the rent payments as previously agreed upon. Subsequently, Open Grounds and Mr. Winslow modified the payment schedule for outstanding land rent. According to Gregory Rowland ("Mr. Rowland"), an officer of Open Grounds, the payment schedule was put into place to assure Open Grounds that there were enough crops in the field to cover the amount of Mr. Winslow's outstanding land rent obligations.

On August 26, 2009, the same day he received the Default Letter, Mr. Winslow opened a bank account in the name of "Belvidere Farmers Exchange Inc. c/o Tanglewood Farms" (the "Belvidere Account") for the purpose of hiding the Debtor's grain proceeds from the Debtor's secured creditor, Meherrin Agricultural & Chemical Company ("Meherrin"). In 2009, Meherrin required that the Debtor's customers pay Meherrin directly instead of making payment to the Debtor. Because of this, the Debtor was unable to access its grain proceeds. In response, the Debtor began selling its grain under the name of Belvidere Farmers Exchange, Inc., to conceal grain proceeds from Meherrin.

As a result, the Debtor's customers issued checks to Belvidere, which Mr. Winslow deposited into the Belvidere Account. In his 2004 Examination Mr. Winslow explained as follows:

> A. I told them they were using – they were taking all the money, and I said, "I'm dealing with grain dealers and I'm dealing with farmers, and I've got to have money to pay them." That's why when I started going through Belvidere Farmers Exchange.
>
> Q. All right. So tell me how they were taking all of your money. How did that happen?
>
> A. Because we were delivering the grain and they were having all the checks made to Meherrin.
>
> Q. The Tanglewood customers were having the checks made to Meherrin?

5

A. Meherrin was having them make them the checks.

Q. Okay. And that's why –

A. And I said I can't do it, and I'm gonna go through Belvidere Farmers Exchange. And that's what I did.

Q. So you are aware that beginning in 2008, 2009, Meherrin was causing Tanglewood's customers to pay Meherrin directly; is that right?

A. They were taking all the grain.

Q. They were taking all the money.

A. They sure were. The way you presented it, I didn't catch it. I didn't catch it. But now I do.

Q. So that's what I'm referring to. When did that start happening?

A. At the beginning of the season.

Q. In 09?

A. That's right. That's correct. You're exactly right.

Q. Now, is it true that ---

A. That's why I said hold, man, you can't do that. I've got to pay my farmers and I've got to pay my dealers. And I started running everything through Belvidere Farmers Exchange. I just weren't letting Belvidere get the money.

*Winslow 2004 Exam, p. 72, line 9 – p. 73, line 17.*

Belvidere did not use or otherwise benefit from the funds that Mr. Winslow deposited in the Belvidere Account. Mr. Nixon, as shareholder of Belvidere, was not involved in setting up the Belvidere Account and he did not have access to bank statements for the Belvidere Account.

On August 27, 2009, Mr. Winslow initiated a wire transfer from the Belvidere Account to

6

Open Grounds in the sum of $300,000.00. One month later, on September 28, 2009, Mr. Winslow initiated a second wire transfer from the Belvidere Account to Open Grounds in the sum of $250,000.00 (collectively, the "Wire Transfers"). Open Ground's bank statements identify the Belvidere Account as the source of the Wire Transfers. Open Grounds had never conducted business with Belvidere in the past. Open Grounds applied the Wire Transfers in the total amount of $550,000.00 to Mr. Winslow's rent obligations under the 2008-2009 Land Rent Agreement.

In addition to the Wire Transfers from the Belvidere Account, Open Grounds also received land rent payments from J.C. Howard Farms (the "J.C. Howard Payments"), as follows:

| Check # | Date | Amount |
|---|---|---|
| 090818 | 09-12-09 | $37,303.83 |
| 090817 | 09-12-09 | $57,831.61 |
| 090724 | 10-08-09 | $32,730.68 |
| 090808 | 10-09-09 | $54,080.06 |
| 090863 | 10-13-09 | $13,292.92 |
| 090840 | 10-13-09 | $49,161.94 |
| 090880 | 10-15-09 | $89,980.33 |
| 090979 | 10-20-09 | $31,925.39 |
| 090986 | 10-21-09 | $6,397.51 |
|  |  | $372,704.29 |

J.C. Howard Farms purchased grain from the Debtor and issued payments directly to Open Grounds, rather than pay the Debtor.

7

**DISCUSSION**

Section 548 provides:

[t]he trustee may avoid any transfer … of an interest of the debtor in property that was made … within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).

The Court finds that the Wire Transfers in the amounts of $300,000.00 and $250,000.00 constitute actually fraudulent transfers subject to avoidance under 11 U.S.C. § 548(a)(1)(A).

The Court finds that the Wire Transfers from the Belvidere Account to Open Grounds, in the total amount of $550,000.00, constitute an interest of the Debtor in property. Mr. Winslow opened the Belvidere Account for the sole purpose of concealing the Debtor's grain proceeds from Meherrin. The Debtor sold its grain under the name "Belvidere Farmers Exchange" and deposited the grain proceeds into the Belvidere Account. Mr. Winslow informed Salmons, Inc., an entity that the Debtor sold grain to, that he was selling the Debtor's grain under the name of Belvidere Farmers Exchange. *Winslow 2004 Exam, p. 153, lines 9- p. 154, line 15*. On or about August 27, 2009, funds in the amount of $300,000.00 were transferred from Salmons, Inc. to the Belvidere Account. *See Bank Statements, p. 1*. That same day, the Debtor executed the $300,000.00 wire transfer from the Belvidere Account to Open Grounds.

The Wire Transfers occurred on August 27, 2009 and September 28, 2009, both within one year prior to the Petition Date of August 20, 2010.

The Court finds that the Wire Transfers were made with actual intent to hinder, delay, or defraud an entity to which the Debtor was indebted. Prior to formation of the Belvidere Account,

Meherrin was directing the Debtor's customers to pay grain proceeds directly to Meherrin. As majority shareholder of Belvidere Inc., Mr. Winslow opened the Belvidere Account. Although the Belvidere Account was opened in the name of Belvidere Farmers Exchange, Mr. Winslow used the Belvidere Account to deposit the Debtor's grain proceeds. By doing this, the Debtor was able to circumvent Meherrin's lien by selling its grain under the name of Belvidere Farmers Exchange. This arrangement allowed the Debtor to bypass Meherrin's lien and disburse grain proceeds to entities such as Open Grounds.

While Mr. Winslow did use some of the funds in the Belvidere Account to pay obligations of the Debtor, the Court finds that one of Mr. Winslow's primary motivations in opening the Belvidere Account was to pay his personal obligations to Open Grounds. The Belvidere Account was opened *on the same day*, August 26, 2009, that Mr. Winslow received the Default Letter from Open Grounds. The first transfer out of the Belvidere Account went to Open Grounds Farm in the amount of $300,000.00.

In addition, the Court finds that Open Grounds received fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B). Under Section 548(a)(1)(B),

> [t]he trustee may avoid any transfer … of an interest of the debtor in property that was made … within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer …; and (I) was insolvent on the date that such transfer was made …, or became insolvent as a result of such transfer…; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Both the Wire Transfers and the J.C. Howard Payments are avoidable as constructively fraudulent transfers under 11 U.S.C. §548(a)(1)(B).

9

The funds transferred from the Belvidere Account constitute an interest of the Debtor in property. The funds in the Belvidere Account constitute grain proceeds belonging to the Debtor. The funds transferred from J.C. Howard Farms constitute an interest of the Debtor in property. The Debtor's records demonstrate that J.C. Howard Farms purchased corn from the Debtor and issued payments directly to Open Grounds Farm. In addition, Winslow admitted during his deposition that the grain that was sold to J.C. Howard Farms belonged to the Debtor. *Deposition of Winslow, p. 63, line 17 – p. 69, line 20.*

The Wire Transfers occurred on August 27, 2009 and September 28, 2009; both within one year prior to the Petition Date of August 20, 2010. Similarly, the J.C. Howard Payments were issued between September and October of 2009 and within one year prior to the Petition Date. As evidenced by the corresponding grain records, the Debtor delivered the grain which generated the J.C. Howard Payments in October of 2009.

The payments at issue were made to Open Grounds in satisfaction of Mr. Winslow's land rent obligations. The Debtor did not receive reasonably equivalent value from these rent payments because the Debtor was not obligated to Open Grounds Farm under any lease and did not own or lease the land for which rent was paid. Both the Wire Transfers and the J.C. Howard Payments constituted proceeds of the Debtor's grain.

The transfers were made at a time when the Debtor was insolvent. The term "insolvent" refers to a financial condition where the sum of the debtor's debts is greater than all of its property. 11 U.S.C. § 101(32). It is readily apparent from the Debtor's schedules and statements of financial affairs and proofs of claim filed in the unconsolidated cases that the Debtor's liabilities substantially exceeded its assets throughout the one-year period prior to the Petition Date. As

evidenced by the Debtor's bankruptcy schedules, incorporated by reference herein, the Debtor had scheduled liabilities of $38,350,562.04 compared to just $3,425,654.64 in assets as of August 20, 2010.

The Debtor's insolvency is further supported by the Debtor's own accounting records. According to balance sheets generated from its Quickbooks records, the Debtor's liabilities exceeded its assets around the time of the transfers at issue. Debtor's balance sheet dated July 31, 2009 shows assets with a value of $9,116,820.34 and liabilities of $14,059,191.52. Debtor's balance sheet dated December 31, 2009, shows assets with a value of $9,714,293.06 and liabilities of $12,071,184.34.

The Wire Transfers are recoverable from Open Grounds pursuant to 11 U.S.C. § 550(a). The property of the Debtor was initially transferred to Belvidere Farmers Exchange, Inc. Specifically, the initial transfer took place when Winslow caused the Debtor's grain proceeds to be deposited into an account in the name of Belvidere Farmers Exchange, Inc. which was set up by Mr. Winslow as majority shareholder of Belvidere Inc. Mr. Winslow then caused the transfer of funds from the Belvidere Account to Open Grounds Farm.

Open Grounds knew that it received payments from a third party with whom it did not conduct business as the source of the Wire Transfers is clear from Open Grounds records, which Open Grounds reviewed regularly. Prior to the transfers, Open Grounds received payments for Mr. Winslow's land rent from Mr. Winslow himself. In contrast, Open Grounds knew that the Wire Transfers were not received from Mr. Winslow. Significantly, Open Grounds was on notice that Mr. Winslow was struggling financially around this time. When Mr. Winslow was unable to pay the second installment under the 2008-2009 Land Rent Agreement, Open Grounds sent him the

11

Default Notice. The next day, Open Grounds Farm received a wire transfer from Belvidere Farmers Exchange for $300,000.00, and a subsequent wire transfer from Belvidere Farmers Exchange for $250,000.00.

As a matter of law, Open Grounds does not meet the subjective and objective standards required to meet the "good faith" defense as set forth in 11 U.S.C 548(c) and 11 U.S.C 550(b)(1) and as adopted by the Fourth Circuit in *In re Nieves,* 648 F.3d 232 (4th Cir. 2011). The affidavit submitted by Gregory Rowland, employee of Open Grounds, states Open Grounds did not notice the Wire Transfers coming in from Belvidere, and had no reason to call into question the payments received from J. C. Howard Farms, Inc. Such a statement stretches credibility when in the same affidavit, Rowland states that Open Grounds had no prior dealings with Belvidere. Such a statement fails to comport with what common sense would demand be the commercially reasonable standard in checking on the receipt of rent payments, and matching them with the appropriate lessee account. As the Fourth Circuit stated in *Rieves,* "the bankruptcy court found that CCM could not satisfy its burden as to the good faith prong when it had willfully turned a blind eye to a suspicious transaction." *Id.* at 241.

Open Grounds did not take the Wire Transfers for value because the Debtor did not receive value in exchange. The Wire Transfers constituted funds generated from the Debtor's grain which were paid by the Debtor's customers. The Wire Transfers were applied to a land rent obligation of Mr. Winslow. The Debtor did not receive value in exchange for paying Mr. Winslow's land rent obligations. Open Grounds Farm had neither a contractual relationship with Belvidere Farmers Exchange nor with J. C. Howard. As a matter of law, Open Grounds Farm has no good faith defense for the receipt of payments from Belvidere and J. C. Howard, when

12

no contractual or other debtor/creditor relationship existed between Open Grounds Farm and Belvidere; and Open Grounds and J. C. Howard.  Open Ground's lease contract was with Mr. Winslow, individually. There is no genuine issue of material fact in regard to the good faith defense claimed by Open Grounds pursuant to 11 U.S.C § 548(c) and § 550(c)(2).

## CONCLUSION

The Wire Transfers and J.C. Howard Payments constitute property of the Debtor which were fraudulently transferred to Open Grounds Farm in satisfaction of an obligation of a non-Debtor entity, Mr. Winslow. The Debtor purposefully hindered, delayed, and defrauded Meherrin by concealing grain proceeds from Meherrin, its primary lien creditor. In addition, the Debtor received less than a reasonably equivalent value for the Wire Transfers and J.C. Howard Payments and was insolvent at the time of the transfers. Reviewing the record in a light most favorable to Open Grounds Farm, the court concludes there is no genuine issue of material fact such that Trustee is entitled to summary judgment as a matter of law as to all claims for relief.

Trustee's Motion for Summary Judgment against Open Grounds Farm, Inc. is **GRANTED.**  The Trustee shall have and recover of and judgment shall be entered against Open Grounds Farm, Inc. in the amount of $922,704.29. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

## END OF DOCUMENT